UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 12-0094 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| SUSAN MICHELLE PLATT | * | MAG. JUDGE KAREN L. HAYES |

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 18] filed by defendant Susan Platt. For reasons stated below, it is recommended that the motion be **DENIED.**

On March 19, 2012, Justin Morris, a Louisiana State Police trooper (sometimes referred to as "Morris" or "Trooper Morris"), stopped Susan Platt ("Platt") for a traffic violation on Interstate 20 in Lincoln Parish, Louisiana. Pursuant to the stop, Trooper Morris ultimately uncovered 17 ounces of suspected methamphetamine secreted within a dog bed on the back seat of Platt's vehicle.

On March 28, 2012, a federal grand jury returned a one count indictment against Platt charging her with possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1).[1] On May 11, 2012, Platt, via counsel, filed the instant motion to suppress all evidence that was seized as a result of the stop and search of her vehicle. Following a delay for briefing and an evidentiary hearing that was held on June 13, 2012, the

---

[1] The indictment also seeks forfeiture of any property derived from, or used in the commission of the underlying offense.

matter is now before the court.[2]

## Background

The following facts were established via the testimony and evidence presented at the June 13, 2012, hearing held in this matter.[3] Three witnesses testified at the hearing: Trooper Justin Morris, Trooper John Peters, and Lincoln Parish Sheriff's Deputy Jim Stephens. Morris is a six year veteran of the Louisiana State Police. (Tr. 5). Trooper Peters is a Louisiana State Police sergeant, with almost 18 years of experience. (Tr. 50). Deputy Stephens has approximately 37-38 years of experience in law enforcement. (Tr. 40-41). At the time of the hearing, Stephens was assigned to the Concentrated Policing Unit with the Lincoln Parish Sheriff's Office. (Tr. 41).

On March 19, 2012, at approximately 16:15, Trooper Morris was on stationary patrol, with his vehicle facing south in the I-20 median at mile marker 85, when he observed an eastbound black Nissan with dark window tint. (Tr. 5-6). As Morris entered the flow of traffic and approached the car, he observed it quickly move over to the right lane, less than two car lengths in front of another vehicle. *Id.*[4] When Morris activated his overhead emergency lights, the car promptly exited the interstate at exit 87, and came to rest in the Spirit gas station lot, on the south side of the interstate. (Tr. 6-7).

---

[2] Defendant filed a post-hearing brief on July 23, 2012. [doc. # 31]. The government filed its post-hearing brief on July 30. [doc. # 35].

[3] Defendant also submitted post-hearing evidence that she obtained from the Lincoln Parish Sheriff and the Louisiana State Police. It consisted of cell phone records for Sergeant John Peters; an MVR malfunction report by Trooper Justin Morris; Louisiana State Police procedures for mobile video/audio recording equipment; and a radio time log for Deputy Stephens. (Def. Post-Hearing Brief, Exhs. [doc. # 31]).

[4] Morris opined that this unsafe lane change constituted an additional violation. (Tr. 27). Nonetheless, he did not cite Platt for this violation. (Tr. 27).

The March 19, 2012, radio log for Troop F, reflects that at 16:21, Trooper Morris radioed headquarters that he was at the Spirit gas station on Louisiana Highway 33. *See* Gov.'t Exh. 1;[5] Tr. 7. After the cars came to a stop, Morris exited his patrol unit and gave loud verbal commands to the driver, later identified as Susan Platt, to exit her vehicle. (Tr. 8). As Platt exited her car, Trooper Morris noticed that she appeared to lock her car door. *Id*.[6] He then gestured her towards him, and met her in front of his car. *Id*. Morris advised Platt that he stopped her because her window tint looked a little dark, and that he intended to check it for compliance. (Tr. 8-9). He also requested her driver's license. *Id*. Morris further asked Platt routine investigatory questions regarding her travel plans, residence, location, whether her address on her driver's license was correct, and the like. (Tr. 9). During this initial questioning, Platt revealed that she had a criminal history in the remote past as a result of a former boyfriend who had gotten her hooked on drugs. *See* Tr. 14.

After this initial questioning, Morris proceeded to check the window tint on Platt's car. (Tr. 9). As he did so, Morris noticed that there was a passenger in the front seat who was shuffling through paperwork in the glove box and acting nervous. (Tr. 9-10). Morris asked the passenger, later identified as Christopher Takewell, what he was looking for. *Id*. Takewell replied that he was looking for the car's paperwork. *Id*. Morris thought this was unusual because he had not asked for any paperwork. *Id*.

Morris also questioned Takewell about the couple's travel plans. (Tr. 10). Although Takewell's story was similar to Platt's, their travel days did not match up. *Id*. Takewell said that

---

[5] Trooper Morris's badge number on the log is "F-28." (Tr. 59). Trooper Peters' number, at that time, was "F-12." (Tr. 54).

[6] Upon cross-examination, Morris was not sure whether she actually locked the door or not. (Tr. 36).

the couple had departed two days earlier than that date Platt had said. *Id*.

By this point, Morris suspected something was afoot. *See* Tr. 10-11. His suspicion stemmed from Platt's apparent attempt to lock her car door, her excessive nervousness, her criminal history, and the couple's inconsistent travel history. (Tr. 10, 15). Morris noted that Platt fidgeted, had a pronounced pulse in her neck, was looking around a lot, and talked too much. (Tr. 15).

Meanwhile, at 16:24 – three minutes after Morris initiated the traffic stop, Trooper Peters arrived on scene to assist. (Gov.'t Exh. 1; Tr. 54-55). When Peters arrived, Morris explained the situation to him. (Tr. 55). Peters testified that Morris told him that he had seen some movement in the passenger seat. *Id*. Thus, Peters went to the passenger side of the car and engaged Takewell. *Id*.

The radio log reflects that Trooper Morris ran Platt's driver's license at 16:28. (Gov.'t Exh. 1; Tr. 11).[7] At 16:30, Morris ran Takewell's driver's license. *Id*. The license checks confirmed that both Platt and Takewell had drug charges in their criminal histories. (Tr. 12). The background check also indicated that Takewell had an outstanding warrant issued by Ouachita Parish. *Id*. Accordingly, Trooper Peters placed Takewell in custody. (Tr. 12).

Meanwhile, Trooper Morris continued his efforts to finish issuing Platt her citation. (Tr. 12). In the process, Morris asked Platt "if she had any illegal contraband in the vehicle and if she had any objections to [him] searching the vehicle." (Tr. 32). Morris inquired about the contraband because of Platt's travel plans, the couple's inconsistent travel plans, their prior drug arrests, and their nervousness. (Tr. 32). Trooper Morris does not recall whether he already had handed Platt the citation when he made the inquiry about the contraband, or whether she still was

---

[7] Morris checked the window tint before running her driver's license. (Tr. 27).

signing it. (Tr. 32). In any event, it was in that general time frame. *Id.*[8]

In conjunction with his request, Morris provided Platt with a consent to search form, which she declined to sign. (Tr. 32-33). The radio log reflects that at 16:39, Morris documented that Platt had refused consent. (Gov.'t Exh. 1; Tr. 16, 38-39). Morris testified that it was possible that there may have been a delay of a couple of minutes between when Platt refused consent and when he reported that fact over the radio. *See* Tr. 16.

Once Platt refused consent to search, Trooper Peters used his state police-issued cell phone to contact Deputy Stephens and his K-9 unit. (Tr. 55-58, 13, 42). Trooper Peters' cell phone records indicate that he called Stephens at 16:38 and again at 16:43. (Def. Resp., Exhs. [doc. # 31]). Deputy Stephens' cell phone records confirm that he received a call at 16:38 and 16:43 from the same number. *Id.* He also called that number at 16:41. *Id.*

Deputy Stephens testified that he was at the courthouse in the sheriff's office when he received the call from Trooper Peters. (Tr. 42). He left the meeting with the sheriff and proceeded to the Spirit gas station where the traffic stop was underway. *Id.* Stephens estimated that, depending upon the traffic, it probably took him at least ten minutes to arrive at the scene. *Id.* However, he radioed the sheriff's office at 16:44, *i.e.* six minutes after he received the call, that he had arrived at the Spirit station. (Def. Resp., Exhs. [doc. # 31]).[9]

After he arrived at the scene, Stephens stood and waited for further direction from the

---

[8] Trooper Morris testified that he wrote the citation within seven to ten minutes of the traffic stop. (Tr. 15). If so, however, then the citation would have been issued by 16:28 or 16:31, around the same time that Morris ran Platt and Takewell's licenses.

[9] The radio log reflects a time of 16:46. *Id.* In a June 14, 2012, letter to the Assistant U.S. Attorney assigned to this case, Lincoln Parish Sheriff's Deputy Michael Rainwater explained that the office's radio voice recorder was out of synch with the official atomic clock by 1 minute and 58 seconds. *Id.*

troopers. (Tr. 43). He then observed the troopers pull Mr. Takewell out of the car and place him in handcuffs. *Id*.[10]

Deputy Stephens testified that his K-9 partner, Gunner, alerted twice to the vehicle – once on the seam of the driver's door, and once on the left rear side of the trunk. (Tr. 44).[11] Stephens testified that, according to his report, Gunner alerted on the car at 16:*38*. (Def. Exh. 3; Tr. 44). Stephens stated that he obtained this time from the Lincoln Parish Sheriff's Department's radio log book. (Tr. 45-47). According to the log book, however, Stephens radioed at 16:*48* (actual time) that he had a K-9 alert. (Def. Resp., Exhs. [doc. # 31]).[12]

The ensuing search proved extremely brief. Platt advised Trooper Morris that she had two small dogs in the backseat. (Tr. 16-17). Thus, Morris immediately went to the rear door of the driver's side and located the dogs. *Id*. He asked Platt if she needed to hold the dogs, but she replied no, he could set them on the ground. (Tr. 16-17). Trooper Peters contemporaneously began to search the front, passenger-side compartment. (Tr. 55).

Morris picked one dog up and placed him on the ground near Platt. (Tr. 17). Platt then

---

[10] In response to a leading question, Trooper Peters agreed that Takewell was taken into custody between the time that his criminal history was requested at 16:30 and when Platt refused consent to search at 16:39. (Tr. 62). Peters must have been mistaken, however, if, in fact, Deputy Stephens observed Takewell's apprehension, *and* Stephens was not summoned until after Platt had refused consent.

Peters' redacted cell phone records indicate that he engaged in two other calls at 16:44 and 16:45. (Def. Resp., Exhs. [doc. # 31]). If these calls came from the troop headquarters, then they would confirm Peters' testimony that the troop notified Peters and Morris by telephone that Takewell had an outstanding warrant. (Tr. 55). At that point, Peters handcuffed Takewell. *Id*.

[11] Stephens had considerable training with K-9 units. In 2005, he received 150 hours of training with his first K-9 partner. (Tr. 41). He later underwent an additional 50 hours of training with Gunner. *Id*.

[12] Clearly, Stephens was mistaken when he reported that Gunner alerted at 16:38 because cell phone records confirm that that was when Peters first called him.

advised Morris that the other dog was sick and lying on a small dog bed. *Id*. Accordingly, Morris picked up the dog bed, with the dog in it, but immediately detected that the bottom of the bed felt out of place. *Id*. It felt hard, rather than soft, and did not seem to belong in the bed. *Id*. So, he set it down, took the dog out of the bed, and immediately searched through the dog bed where he uncovered two large bags of suspected crystal methamphetamine that was later determined to total 17 ounces. *Id*. Morris proceeded to handcuff Ms. Platt. *Id*.

     The state police radio log indicates that Platt was taken into custody at 16:51. (Gov.'t Exh. 1; Tr. 17). Deputy Stephens radioed at 16:50 (actual time) that two were in custody. (Def. Resp., Exhs. [doc. # 31]). Thus, according to Stephens' radio logs, the search lasted less than two minutes. Stephens estimated that 15 to 16 minutes elapsed from the time that he received the call until the time that the K-9 unit alerted. (Tr. 47). However, the cell phone and radio log records confirm that only ten minutes had elapsed. (Def. Resp., Exhs. [doc. # 31]).

     Trooper Morris testified that although his patrol car was equipped with video recording equipment, there was no video recording of the Platt traffic stop. (Tr. 21-22). He testified that sometimes his camera worked, and sometimes it did not work. *Id*. Most of the time, it did not work. *Id*. By March 19, however, the camera did not operate at all. (Tr. 22-23). According to state police procedures, Trooper Morris was required to advise his supervisor that his camera was inoperable. *See* Tr. 23; Def. Resp., Exhs. [doc. # 31]. Once a problem is reported, the officer or desk sergeant must make a desk log entry indicating that a video recorder has malfunctioned. (Def. Resp., Exhs. [doc. 31]).

     Log records indicate that Trooper Morris reported a video recorder malfunction on October 15, 2011. (Def. Resp., Exhs. [doc. 31]; Tr. 24-25). Sergeant Peters testified that a trooper with a malfunctioning camera is not required to report that his camera is malfunctioning

every day until it is fixed or replaced. (Tr. 53). Peters further testified that malfunctioning video cameras were a recurring problem in the older patrol units. (Tr. 59-60).

## Law and Analysis

I.  **The Stop and Detention**

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks omitted). A traffic stop entails a seizure for purposes of the Fourth Amendment. *Id.*; *see also*, *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupant(s) constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality

8

of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

    a)     <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

In this case, it is uncontroverted that Trooper Morris observed a car that appeared to have a windshield that was tinted darker than the legal limit. Accordingly, he elected to investigate further. When he pulled behind Platt's vehicle, he observed her switch lanes in an unsafe manner. At that point, he activated his emergency lights, and signaled for Platt to pull over. Morris used a tint meter to test the amount of light that passed through the windshield. Apparently, the tint meter confirmed that the tint was illegal because Morris wrote Platt a citation

for the infraction. *See* Tr. 15-16.[13] Having observed and listened to Trooper Morris at the hearing, the court finds his testimony to have been earnest, persuasive, and entirely credible.

In Louisiana,

> no person may operate a motor vehicle with any object or material placed on or affixed to the front windshield or to front side windows of the vehicle so as to obstruct or reduce the driver's clear view through the front windshield or front side windows, nor place on or affix to the front windshield or the front side windows of a motor vehicle, any transparent material if the material alters the color or reduces the light transmission of the windshield or front side windows.

La. Rev. Stat. Ann. § 32:361.1.

Trooper Morris's observation that Platt's windows were too dark provided him with reasonable suspicion to believe that she had violated Louisiana Revised Statute 32:361.1, which, in turn, provided him with an objectively reasonable basis to initiate the traffic stop. *See State v. Hunt*, 25 So.3d 746, 753 (La. 2009); *State v. Sims*, 914 So. 2d 594, 599 (La. App. 2d Cir. 2005).[14]

    b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle

---

[13] Neither side introduced the citation or the arrest report into evidence.

[14] Having found that Morris had an objectively reasonable basis to stop Platt for illegal window tint, his alternative grounds to stop her for an illegal lane change is redundant.

was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions. *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437. "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431. Detention during these actions is reasonable under the Fourth Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431 (citations omitted). "[T]o continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citation omitted). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (citations omitted). Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted). Reasonable suspicion depends upon the "totality of the circumstances and the collective knowledge and experience of the officer or officers." *Id*.

In this case, the initial questioning of Platt and Takewell by the two troopers was fully within the scope of the initial traffic stop. During the initial encounter, Morris noted that Platt

appeared to lock her car door when she exited the vehicle; that Platt and Takewell's respective accounts of their travel plans were off by two days; that Platt had a criminal history that included drug charges; that Takewell rummaged nervously for documents in the glove compartment without having been asked to do so; and Platt's excessive nervousness. Furthermore, although not articulated by Morris, he encountered Platt and Takewell during their return leg along a known drug corridor, I-20. The initial questioning and test of the window tint extended for seven minutes before Morris ran Platt's license. The length of the initial questioning was not unreasonable. *See Brigham, supra* (seven minutes of initial questioning not unreasonable).

The record is not uniform as to what occurred next. The court resolves the conflicting accounts by finding that Trooper Morris wrote the citation for the illegal window tint around the 16:31 mark. *See* Tr. 15-16 (Morris stated that he wrote the citation within seven to ten minutes of the traffic stop). It may have taken Morris several more minutes to complete the citation. Moreover, in conjunction with his issuance of the citation, Morris sought, but did not receive Platt's consent to search the vehicle. This also may have taken some time because Morris provided Platt with a consent to search form for her to review.

After Platt refused consent to search, Trooper Peters summoned Deputy Stephens and his K-9 unit at 16:38. *See* cell phone records; Def. Resp., Exhs. [doc. # 31]. Stephens arrived on scene some six minutes later at 16:44, according to his radio log. (Def. Resp., Exhs. [doc. # 31]). Stephens then observed the troopers remove and handcuff Takewell.[15] Stephens initiated the K-9 "free air search" of the car promptly after Takewell's apprehension because he radioed at 16:48 that his dog had alerted. (Def. Resp., Exhs. [doc. # 31]). By 16:50, the search was completed,

---

[15] Trooper Morris agreed that Stephens arrived in close proximity to the time that Takewell was placed into custody. (Tr. 13-14).

and Platt was in custody.

The court acknowledges that there is some conflict in the record as to when Takewell was taken into custody. Although the court has resolved the discrepancy by finding that he was apprehended at the tail end of the relevant time line, resolution of this issue is not material to the outcome of the motion to suppress because, under either scenario, the troopers still required reasonable suspicion to extend the duration of the stop once they had completed the background checks, issued the traffic citation, and/or apprehended Takewell. For example, even if the purpose of the initial stop was resolved by 16:35, it was not unreasonable to extend the stop by nine minutes to wait the K-9 unit – so long as the troopers had reasonable suspicion to do so. *See United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010), opinion modified on denial of rehearing, 622 F.3d 383 (5th Cir. 2010), *cert denied*, ___ U.S. ___, 131 S.Ct. 620 (2011) (eight minute wait for K-9 unit was not unreasonable).

In this case, the court finds that the troopers did enjoy sufficient articulable facts to extend the stop. Although it is clear that, generally, neither a combination of excessive nervousness and inconsistent statements,[16] nor inconsistent statements and prior drug arrests,[17] will provide reasonable suspicion to extend a traffic stop, the balance shifts in favor of the officers, when, as here, the passengers provide inconsistent, irreconcilable travel plans; exhibit excessive nervousness; confess prior drug arrests; and engage in other odd behavior such as attempting to lock the car door when they exit the vehicle. *See United States v. Sierra*, 294 Fed. Appx. 884 (5th Cir. Sept. 30, 2008) (unpubl.) (nervousness, plus maps of drug trafficking towns

---

[16] *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002).

[17] *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000).

13

not on driver's expressed itinerary created reasonable suspicion of criminal activity); *Pack, supra* (reasonable suspicion of criminal activity created by extreme nervousness, conflicting story, and travel along drug corridor); *Brigham, supra* (citing *United States v. Gonzalez*, 328 F.3d 755, 758-759 (5th Cir. 2003) ("driver's nervousness, hesitation in responding to basic itinerary questions, lies about identification, presence on a drug trafficking corridor, and prior arrests for drug trafficking, taken together, gave rise to a reasonable and articulable suspicion of drug trafficking."); *United States v. Rodriguez*, 155 Fed. Appx. 753 (5th Cir. Nov. 21, 2005) (unpubl.) (driver's delay in pulling over and exiting vehicle, excessive nervousness and sweating, repeated declarations that he wanted no problems, and prior narcotics arrests provided reasonable suspicion). Although superfluous to a finding of reasonable suspicion in this case, the court further observes that the traffic stop occurred on a known drug corridor. *See United States v. Jenson*, 462 F.3d 399, 405-406 (5th Cir. 2006) (recognizing that I-20 is a known drug corridor).

      To the extent that defendant contends that one or more facts relied upon by Morris are susceptible to benign explanation, the undersigned observes that courts are constrained from examining and rejecting individually each factor that the police cite as having creating reasonable suspicion. *Pack*, 612 F.3d at 358. Thus, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1587 (citations omitted); *Pack supra*. Moreover, the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 751 (2002) (citations omitted). The courts generally are obliged to accord deference and even "great respect" to an officer's training and experience. *See Jenson, supra*.

Defendant stresses the fact that there was no video recording of the traffic stop in this case, and Trooper Morris's purported failure to comply with department procedures in this regard. However, the court fully credits Trooper Morris's explanation that his mobile video recorder had been malfunctioning since October 2011. Furthermore, Morris reported the malfunction to his supervisor when it first occurred. Trooper Peters confirmed that Morris was not obliged to continually report the malfunction at the beginning of each subsequent shift. Had Morris continued to report the malfunction on a daily basis, the court envisions that Morris would not have endeared himself to his superiors.

In any event, to the extent that Morris's actions or inaction transgressed some state law regulation, provision, or even the Louisiana Constitution, the court observes that the exclusionary rule discourages violations of the Fourth Amendment to the U.S. Constitution, not violations of state law: "[t]he question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) (citation omitted).

Thus, the lack of a video recording in this case and/or the alleged failure to comply with associated departmental regulations goes to the credibility of the stopping officers. Although the officers' testimony included some inconsistencies on timing, resolution of the timing discrepancies does not materially impact the motion to suppress. *See* discussion, *supra*. Moreover, the officers' version of events is not contested by testimony from anyone else present at the scene.

**III.   The Sniff and Search**

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991). One such exception that is "specifically established and well-delineated" is the so-called automobile exception. *United States v. Ross*, 456 U.S. 798, 825 (1982). "The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.

An alert by a trained canine provides officers with probable cause to search a car. *United States v. Sanchez–Pena*, 336 F.3d 431, 444 (5th Cir.2003) ("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."); *United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir.1995) (once dog alerted to the interior wall of the van, police had probable cause to dismantle the wall). "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.

Here, once the K-9 unit alerted on the car, the troopers obtained probable cause to search

16

the vehicle and its contents. Furthermore, the discovery of a hidden compartment in the dog bed provided probable cause to search the dog bed. *Estrada, supra* ("evidence of a hidden compartment supports 'probable cause' for a search/arrest . . .").

Finally, as in *Pack, supra*, the court finds that the overall length of the traffic stop and detention in this case were not unreasonable. The elapsed time from the inception of the traffic stop until Platt's arrest totaled but 29-30 minutes. *Compare Pack, supra* (officers discovered contraband within 35 minutes of the initial stop).

In sum, the court finds that the troopers' actions demonstrated a "graduated response to emerging facts, [which] were reasonable under the totality of the circumstances, and did not unconstitutionally extend [Platt's] detention." *United States v. Pauyo*, 341 Fed. Appx. 955, 956 (5th Cir. Aug. 18, 2009) (unpubl.), cert. denied by *Pauyo v. United States*, ___U.S.___, 130 S.Ct. 2079 (Mar 29, 2010) (citation omitted).

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 18] filed by defendant Susan Platt be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 6th day of August 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE